FILED
IN OPEN COURT

MAY 2 3 2014

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 2:14cr___79 |
| | ) | |
| v. | ) | 18 U.S.C. § 371 |
| | ) | Conspiracy to Commit Bribery of a Public |
| SCOTT B. MISERENDINO, SR., | ) | Official |
| (Counts 1, 4, 5, & 6) | ) | (Count 1) |
| | ) | |
| and | ) | 18 U.S.C. § 201(b)(1)(A) |
| | ) | Bribery of a Public Official |
| TIMOTHY S.MILLER, | ) | (Counts 2-3) |
| (Counts 1, 2 & 3) | ) | |
| | ) | 18 U.S.C. § 201(b)(2)(A) |
| Defendants. | ) | Acceptance of Bribe by a Public Official |
| | ) | (Count 4) |
| | ) | |
| | ) | 18 U.S.C. § 371 |
| | ) | Conspiracy to Commit Obstruction of |
| | ) | Criminal Investigations |
| | ) | (Count 5) |
| | ) | |
| | ) | 18 U.S.C. § 1510(a) |
| | ) | Obstruction of Criminal Investigations |
| | ) | (Count 6) |
| | ) | |
| | ) | Forfeiture Notice |
| | ) | 18 U.S.C. § 981 (a)(1)(C) |

May 2014 Term – At Norfolk, Virginia

### INDICTMENT

THE GRAND JURY CHARGES THAT:

At all times material to the Indictment, unless otherwise stated:

### Introduction

1.     The Military Sealift Command (MSC), an entity of the United States Navy, was the

leading provider of transportation for the Navy and the rest of the Department of Defense and

operated a fleet of approximately 110 ships.  MSC Headquarters was located in Washington, D.C.

2.      Kenny E. Toy was a civil servant employed at the MSC Headquarters as the Afloat Programs Manager for the N6 (Command, Control, Communication, and Computer Systems) Directorate (N6).  Prior to holding this position, Toy was a Senior Systems Engineer for N6 and managed programs associated with fleet telecommunications systems.

3.      SCOTT B. MISERENDINO, SR., the defendant, was a government contractor at MSC who was employed by two companies that held multi-million dollar contracts to provide information technology and communications services and support to MSC.  MISERENDINO, acting on behalf of the United States, worked closely with Toy in managing MSC's telecommunications projects by writing Statements of Work, preparing and executing budgets, reviewing proposals, and influencing the awarding of U.S. Government contracts, subcontracts, and task orders.

4.      Company A, a Virginia corporation, was established by its owners, Roderic J. Smith and Dwayne A. Hardman, on or about November 19, 2004.  Company A was established as a government contracting company to provide support to MSC on various telecommunications projects.  In or around early 2005, Company A hired Adam C. White as an additional partner and also hired Michael P. McPhail as an employee.  At all relevant times, Company A's corporate offices were located in Chesapeake, Virginia.

5.      Company B, a Virginia corporation, was established as a business by TIMOTHY S. MILLER, the defendant, and Hardman, on or about February 5, 2009.  Company B was established as a government contracting company to provide support to MSC on various

telecommunications projects. At all relevant times, Company B's corporate offices were located

in Chesapeake, Virginia.

6.      The above introductory allegations are re-alleged and incorporated in each count of this

Indictment as if fully set forth in each count.

**Count One**
**(Conspiracy to Commit Bribery of a Public Official)**

7.      From in or about November 2004 to in or about November 2009, in the Eastern District

of Virginia and elsewhere, defendants

**SCOTT B. MISERENDINO, SR., and**
**TIMOTHY S. MILLER**

did knowingly and unlawfully combine, conspire, and agree together with each other and others,

both known and unknown to the Grand Jury, to commit one or more of the following offenses

against the United States, that is:

>      1.      to directly or indirectly, corruptly give, offer, and promise anything of value to
> any public official to influence an official act, in violation of Title 18, United States
> Code, Section 201(b)(1)(A); and
>
>      2.      being a public official, to directly or indirectly, corruptly demand, seek, receive,
> accept, and agree to receive or accept anything of value personally, in return for being
> influenced in the performance of an official act, in violation of Title 18, United States
> Code, Section 201(b)(2)(A).

PURPOSE

8.      It was a purpose of the conspiracy for Company A, through its agents Smith, Hardman,

McPhail, and White, and Company B, through its agents Hardman and MILLER, to corruptly

give, offer, and agree to give cash payments and other things of value to MISERENDINO and

Toy, with the intent to influence MISERENDINO and Toy to provide favorable treatment to

Company A and Company B in connection with U.S. Government contracts, subcontracts, and

task orders.

3

9.     It was further a purpose of the conspiracy for MISERENDINO and Toy to enrich themselves by accepting cash payments and other things of value with the intent of being influenced and rewarded for providing favorable treatment to Company A and Company B in connection with U.S. Government contracts, subcontracts, and task orders.

10.    It was further a purpose of the conspiracy to hide, conceal, and obscure the true nature, source, and control of the money MISERENDINO and Toy received, and to hide, conceal, and obscure the planning, execution, and nature of the conspiracy.

<u>MANNER AND MEANS OF THE CONSPIRACY</u>

11.    The manner and means by which the conspiracy was carried out included, but were not limited to, the following:

a.  MISERENDINO and Toy solicited and obtained, both directly and indirectly, for personal gain, cash payments and other things of value from defendant, Company A and its agents, and from Company B and its agents;

b.  MILLER, Company A, Smith, Hardman, McPhail, White, and Company B, together with others known and unknown to the grand jury, provided financial payments and other things of value to MISERENDINO and Toy;

c.  Company A, Smith, and Hardman hired McPhail and White, who performed little work for their pay, and required McPhail and White to surrender $1,000 from each of their paychecks to be provided to MISERENDINO and Toy;

d.  MISERENDINO and Toy provided official action on behalf of MSC that was favorable to Company A, Company B, MILLER, Hardman, Smith, McPhail, White, and others, including the following:

4

    i.      assisting in the preparation of Statements of Work for tasks that Company A and Company B sought to perform under U.S. Government contracts, subcontracts, and task orders;

    ii.     influencing, or causing to be influenced, other government officials to further Company A's and Company B's efforts to obtain U.S. Government contracts, subcontracts, and task orders;

    iii.    influencing, or causing to be influenced, MSC contractors to further Company A's and Company B's efforts to obtain U.S. Government subcontracts and task orders;

    iv.    facilitating the transfer of government funds to MSC contractors so that Company A and Company B could receive subcontracts and task orders;

    v.      providing advice to Company A and Company B on appropriate bid amounts for subcontract proposals; and

    vi.    providing favorable treatment to Company A and Company B in connection with U.S. Government contracts, subcontracts, and task orders.

e.  MISERENDINO, MILLER, and Company A, together with Toy, Smith, Hardman, McPhail, White, Company B and others known and unknown to the grand jury, took steps to conceal from MSC and law enforcement authorities the things of value MISERENDINO and Toy received to hide the nature and scope of the conspiracy;

f.  Toy converted the cash payments into United States Postal Service (USPS) Money Orders, which he then used to pay credit card balances, mortgage payments, and other creditors and service providers;

g.  MILLER attempted to disguise the corrupt nature of the bribery scheme by causing the creation of false business records for Company B; and

h.  MILLER made false statements to law enforcement officials.

## OVERT ACTS

12.   In furtherance of the conspiracy and to affect its objects, defendants SCOTT B. MISERENDINO, SR., TIMOTHY S. MILLER, and Company A, and co-conspirators Toy, Hardman, Smith, McPhail, White, and Company B committed and caused to be committed the following acts within the Eastern District of Virginia:

a.   On or about November 19, 2004, Hardman and Smith established Company A, located in Chesapeake, Virginia, as a government contracting company designed to provide support to the MSC and other U.S. Government entities.

b.   In or about late 2004 and early 2005, MISERENDINO and Toy agreed with Hardman and Smith to give favorable treatment to Company A in connection with U.S. Government contracts, subcontracts, and task orders in exchange for receiving cash payments from Company A.

c.   In or around late 2004, Toy and MISERENDINO arranged with an MSC contracting company to enter into a teaming agreement with Company A which would allow the contracting company to award subcontracts to Company A.

d.   In or around late 2004, MISERENDINO provided bid information to Company A.

e.   Beginning in or around March 2005, MISERENDINO and Toy began accepting approximately $3,000 in cash per month from Company A, hand-delivered to them by Hardman at various locations in the Eastern District of Virginia.

f.      Between in or around March 2005 and in or around 2007, Smith withdrew a total of approximately $50,000 in cash from his personal bank account, where his Company A paychecks were deposited, to provide to MISERENDINO and Toy, through Hardman, on various dates.

g.      Between in or around March 2005 and in or around 2009, Hardman withdrew a total of approximately $80,000 in cash from his personal bank account, where his Company A paychecks were deposited, to provide to MISERENDINO and Toy on various dates.

h.      In or around March and April 2005, Hardman and Smith hired Company A employees McPhail and White.

i.      In or around March and April 2005, McPhail and White agreed to contribute approximately $1,000 each from their bi-weekly Company A paychecks to pay MISERENDINO and Toy in exchange for MISERENDINO and Toy providing favorable treatment to Company A in connection with U.S. Government contracts, subcontracts, and task orders.

j.      Between in or around March 2005 and in or around January 2007, McPhail and Smith withdrew approximately $45,000 in cash from a joint bank account, where McPhail's Company A paychecks were deposited, to provide to MISERENDINO and Toy, through Hardman, on various dates.

k.      Between in or around April 2005 and in or around March 2006, White withdrew approximately $26,000 in cash from his personal bank account, where his Company A paychecks were deposited, to provide to MISERENDINO and Toy, through Hardman, on various dates.

l.      On or about June 14, 2005, Smith withdrew approximately $2,000 in cash from his personal bank account.

m.      On or about June 17, 2005, Toy used cash to purchase a $250 USPS Money Order in Merrifield, Virginia.

n.      On or about December 15, 2005, Smith withdrew approximately $2,000 in cash from his personal bank account.

o.      On or about January 18, 2006, Hardman withdrew approximately $3,000 in cash from his personal bank account.

p.      On or about January 19, 2006, Toy used cash to purchase a $500 USPS Money Order in Chantilly, Virginia.

q.      On or about August 22, 2006, Hardman withdrew approximately $3,000 in cash from his personal bank account.

r.      On or about August 22, 2006, Smith withdrew approximately $1,950 in cash from his personal bank account.

s.      On or about August 22, 2006, McPhail withdrew approximately $1,000 in cash from this personal bank account.

t.      On or about December 11, 2006, Hardman withdrew approximately $8,000 in cash from his personal bank account.

u.      On or about December 11, 2006, Toy used cash to purchase a $500 USPS Money Order in Centreville, Virginia.

v.      On or about December 13, 2006, Toy used cash to purchase a $500 USPS Money Order in Washington, D.C.

w.      On or about December 14, 2006, Toy used cash to purchase $1,000 in USPS Money Orders in Lorton, Virginia.

x.    On or about January 10, 2007, Hardman withdrew approximately $3,000 in cash from his personal bank account.

y.    On or about January 10, 2007, Smith withdrew approximately $2,000 in cash from his personal bank account.

z.    On or about January 12, 2007, Toy used cash to purchase a $500 USPS Money Order in Centreville, Virginia.

aa.    On or about March 7, 2007, Hardman withdrew approximately $2,600 in cash from his personal bank account.

bb.    On or about March 9, 2007, Toy used cash to purchase a $500 USPS Money Order in Centreville, Virginia.

cc.    On or about August 29, 2007, Toy used cash to purchase $1,500 in USPS Money Orders in Chesapeake, Virginia.

dd.    On or about October 19, 2007, Toy used cash to purchase $1,000 in USPS Money Orders in Centreville, Virginia.

ee.    On or about September 5, 2008, Toy used cash to purchase a $500 USPS Money Order in Centreville, Virginia.

ff.    On or about October 10, 2008, Toy used cash to purchase an $800 USPS Money Order in Chantilly, Virginia.

gg.    On or about November 10, 2008, Toy used cash to purchase $2,000 in USPS Money Orders in Centerville, Virginia.

hh.    On or about December 12, 2008, Toy used cash to purchase $2,000 in USPS Money Orders in the Centreville, Virginia.

ii.     In or around late 2008 and early 2009, Hardman recruited MILLER to assist him with establishing a new company, Company B.

jj.     In or around late 2008 and early 2009, MISERENDINO and Toy agreed to direct MSC-related work to Company B in exchange for additional bribes.

kk.     In or around late 2008 and early 2009, Smith, on behalf of Company A, agreed to accept subcontract work from Company B.

ll.     On or about February 5, 2009, Hardman and MILLER established Company B.

mm.     In or around late 2008 and early 2009, MISERENDINO and Toy assisted Company B in obtaining MSC-related task orders.

nn.     In or around March 2009, MILLER directed an employee at Company B to create a false promissory note pertaining to a forthcoming $60,000 withdrawal from Company B funds.

oo.     On or about May 11, 2009, MISERENDINO spoke with Hardman by telephone and stated that he (MISERENDINO) and Toy expected to receive a bribe payment while at Company B's offices on May 12, 2009.

pp.     On or about May 12, 2009, MILLER wrote a check, drawing on funds from a Company B bank account, in the amount to $60,000, which he made payable to Hardman.

qq.     On or about May 12, 2009, Hardman attempted to cash the $60,000 check but was provided only $30,000 in cash, due to the bank's limited cash supply, and a cashier's check for the remaining $30,000.

rr.     On or about May 12, 2009, through on or about May 14, 2009, MISERENDINO and Toy traveled to Chesapeake, Virginia, from Washington, D.C.

ss.     On or about May 12, 2009, MILLER and Hardman gave MISERENDINO and Toy approximately $30,000 in cash at Company B's offices.

tt.    On or about May 13, 2009, Toy used cash to purchase $2,000 in USPS Money Orders in Chesapeake, Virginia.

uu.    On or about May 14, 2009, in the Eastern District of Virginia, Hardman gave Toy approximately $20,000 in cash.

vv.    On or about May 15, 2009, Toy used cash to purchase $4,000 in USPS Money Orders in Fairfax County, Virginia.

ww.    On or about May 28, 2009, MILLER directed an employee at Company B to create a false promissory note pertaining to the $60,000 withdrawal from Company B funds.

xx.    On or about July 30, 2009, Toy used cash to purchase $1,700 in USPS Money Orders in Chantilly, Virginia.

yy.    On or about September 4, 2009, Toy used cash to purchase $1,700 in USPS Money Orders in Chantilly, Virginia.

zz.    On or about November 9, 2009, Toy used cash to purchase a $500 in USPS Money Order in Chantilly, Virginia.

(In violation of Title 18, United States Code, Section 371.)

## Count Two
### (Bribery of a Public Official)

From on or about May 12, 2009, until on or about May 14, 2009, in the Eastern District of Virginia, defendant

### TIMOTHY S. MILLER

did, directly and indirectly, corruptly give, offer, and promise a thing of value to a public official, with intent to influence an official act, that is, MILLER gave approximately $25,000 in cash to SCOTT B. MISERENDINO, SR., a public official who was employed as a government contractor, in exchange for MISERENDINO agreeing to provide favorable treatment to

11

MILLER's corporation, Company B, in connection with U.S. Government contracts,

subcontracts, and task orders.

(In violation of Title 18, United States Code, Sections 201(b)(1)(A) and 2.)

### Count Three
### (Bribery of a Public Official)

From on or about May 12, 2009, until on or about May 14, 2009, in the Eastern District

of Virginia, defendant

## TIMOTHY S. MILLER

did, directly and indirectly, corruptly give, offer, and promise a thing of value to a public official,

with intent to influence an official act, that is, defendant MILLER provided approximately

$25,000 cash to Kenny E. Toy, a public official, in exchange for Toy agreeing to provide

favorable treatment to MILLER's corporation, Company B, in connection with U.S. Government

contracts, subcontracts, and task orders..

(In violation of Title 18, United States Code, Sections 201(b)(1)(A) and 2.)

### Count Four
### (Acceptance of Bribe by a Public Official)

On or about May 12, 2009, in the Eastern District of Virginia, defendant

## SCOTT B. MISERENDINO, SR.,

a public official who was employed as a government contractor, directly and indirectly did

corruptly demand, seek, receive, accept, and agree to receive and accept something of value

personally, in return for being influenced in the performance of an official act, that is,

MISERENDINO accepted approximately $25,000 in cash from TIMOTHY S. MILLER and

Dwayne A. Hardman, owners of a government contracting corporation, Company B, in exchange

for MISERENDINO agreeing to provide favorable treatment to Company B in connection with

U.S. Government contracts, subcontracts, and task orders.

(In violation of Title 18, United States Code, Sections 201(b)(2)(A) and 2.)

### Count Five
### (Conspiracy to Commit Obstruction of Criminal Investigations and to Commit Tampering with a Witness)

1.      From in or about December 2010 until in or about July 2013, in the Eastern District of

Virginia and elsewhere, defendant

### SCOTT B. MISERENDINO, SR.,

did knowingly and unlawfully combine, conspire, and agree with Kenny E. Toy, Roderic J.

Smith, and Dwayne A. Hardman, and others known and unknown to the Grand Jury, to commit

one or more offenses against the United States, that is, to willfully endeavor by means of bribery

to obstruct, delay, and prevent the communication of information relating to a violation of any

criminal statute of the United States to a criminal investigator, in violation of Title 18, United

States Code, Section 1510(a), and to corruptly persuade Dwayne A. Hardman with the intent to

hinder, delay, and prevent the communication to a law enforcement officer of the United States

of information relating to the commission, or possible commission, of a federal offense, in

violation of Title 18, United States Code, Section 1512(b)(3).

PURPOSE OF THE CONSPIRACY

2.      It was the purpose of the conspiracy to obstruct, delay, and prevent the communication by

Dwayne A. Hardman to law enforcement of information relating to the bribery scheme charged

in Count One of this Indictment.

13

3.     It was a further purpose of the conspiracy to corruptly persuade Dwayne A. Hardman, and attempt to do so, with the intent to hinder, delay, and prevent the communication to law enforcement of information relating to the conspiracy charged in Count One of this Indictment.

## OVERT ACTS

4.     In furtherance of the conspiracy, and to effect its objects, MISERENDINO and his co-conspirators committed and caused to be committed the following overt acts within the Eastern District of Virginia:

a.     In or about December 2010, Hardman told MISERENDINO, Toy, and others that he would report the bribery scheme to the authorities unless they provided money to him.

b.     On December 16, 2010, Hardman sent an email to Smith, informing Smith that he had told MISERENDINO and Toy what they "should do to make things right."

c.     In or about December 2010 or early 2011, Smith met with MISERENDINO and Toy regarding Hardman's threats to report them to the authorities. During that meeting, MISERENDINO and Toy expressed concerns to Smith that Hardman might report their illegal conduct. MISERENDINO, Toy, and Smith agreed that Smith should provide Hardman money.

d.     In or about December 2010 or January 2011, Smith informed Hardman that Smith would pay him.

e.     From in or about late 2010 through in or about early 2012, Smith provided Hardman ten monthly payments of approximately $4,000, totaling approximately $40,000, in an attempt to prevent him from reporting the bribery scheme to law enforcement. Hardman did not perform any work or provide any services in exchange for these monetary payments other than not reporting.

f.      In or around January 2013, during a conversation with Toy, Hardman threatened to report the bribery scheme to law enforcement authorities if he did not receive additional money.

g.      On or about January 8, 2013, Hardman sent an email to Toy that referenced Hardman's loyalty and the "secrets" he knew.

h.      On or about January 10, 2013, Hardman emailed Toy to provide "one last chance for you and MISERENDINO to do the right thing for once." In the same email, Hardman threatened to contact an MSC official.

i.      In or around January 2013, Toy contacted Hardman regarding the email Hardman sent to him. During the telephone conversation, Hardman requested financial assistance from Toy in return for not reporting the bribes that Hardman had provided to MISERENDINO and Toy.

j.      In or around January 2013, at MISERENDINO's request, Smith met with MISERENDINO and Toy at a restaurant in Chesapeake, Virginia. During that meeting, MISERENDINO, Toy, and Smith discussed Hardman's threats and agreed that Smith would pay Hardman in an attempt to keep Hardman from reporting the illegal conduct to law enforcement authorities.

k.      In or around January 2013, Smith informed Hardman that MISERENDINO and Toy had agreed to assist in providing financial payments to Hardman by directing U.S. Government contracting work to Hardman through Company A and Company C, a company owned by Smith.

l.      From in or around January 2013 until in or around July 2013, Smith employed Hardman as a consultant for Company C.

15

m.    From in or around January 2013 until in or around July 2013, Smith caused Hardman to be issued paychecks totaling approximately $45,000 in an attempt to prevent him from reporting the bribery scheme to law enforcement. Hardman performed little work in exchange for the paychecks.

n.    As a result of the payments arranged by MISERENDINO, Toy, and Smith, Hardman did not report the bribery scheme to law enforcement authorities until the authorities approached Hardman in or around March 2013.

(In violation of Title 18, United States Code, Section 371.)

### Count Six
### (Obstruction of Criminal Investigations, Aiding and Abetting)

From on or about December 2010 until on or about July 2013, in the Eastern District of Virginia and elsewhere, defendant

### SCOTT B. MISERENDINO, SR.,

did willfully endeavor by means of bribery to obstruct, delay, and prevent the communication by Dwayne A. Hardman of information relating to a violation of any criminal statute of the United States to a criminal investigator.

(In violation of Title 18, United States Code, Sections 1510(a) and 2.)

### FORFEITURE NOTICE

Defendants, SCOTT B. MISERENDINO, SR., and TIMOTHY S. MILLER, upon conviction of the offenses charged in Counts 1 through 6 of the Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2.

16

1.      Any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses charged therein.  Property subject to forfeiture includes, but is not limited to:

a.      MISERENDINO: A sum of money of not less than $212,500 which represents the proceeds of the charged offenses that, upon entry of an order of forfeiture, shall be reduced to a monetary judgment.

b.      MILLER: A sum of money of not less than $1,124,842.00 which represents the proceeds of the charged offenses that, upon entry of an order of forfeiture, shall be reduced to a monetary judgment.

2.      If property, as a result of any act or omission of the defendants:  (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third person, (c) has been placed beyond the jurisdiction of the court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be subdivided without difficulty, the United States of America shall be entitled to forfeiture of any other property of the defendants, up to the value described herein, as subject to forfeiture under Title 21, United States Code, Section 853(p).

(In accordance with 18 U.S.C. § 981 (a)(1)(C) as incorporated by 28 U.S.C. §2461(c) and 21 U.S.C. § 853(p)).

*United States v. Scott B. Miserendino, et al.*
Criminal No. 2:14cr 79

A TRUE BILL

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____
Foreperson

DANA J. BOENTE
United States Attorney
Eastern District of Virginia

JACK SMITH
Chief, Public Integrity Section
Criminal Division
United States Department of Justice

By: _____
Stephen W. Haynie
Assistant United States Attorney

By: _____
Emily Rae Woods
Trial Attorney
Special Assistant United States Attorney

18