UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 2:14cr79 |
| | ) | |
| SCOTT B. MISERENDINO, Sr., | ) | Sentencing Date: Nov. 7, 2014 |
| Defendant. | ) | |
| | ) | |

### UNITED STATES' SENTENCING BRIEF

The defendant, Scott B. Miserendino, Sr., a public official at the United States Navy Military Sealift Command, orchestrated an extensive five-year bribery scheme whereby he and another public official solicited and accepted more than $265,000 in cash bribes and other things of value from at least five co-conspirators through two different companies in exchange for providing favorable treatment in connection with U.S. government contracting work. He also participated in an obstruction scheme to pay approximately $88,000 to a co-conspirator in an attempt to prevent that co-conspirator from revealing Miserendino's criminal conduct to law enforcement authorities. Miserendino is now before this Court for sentencing having pleaded guilty to Conspiracy to Commit Bribery, in violation of 18 U.S.C. § 371, and Acceptance of a Bribe by a Public Official, in violation of 18 U.S.C. § 201(b)(2)(A). For the reasons set forth below, the United States concurs with the Presentence Investigation Report's calculation of the applicable Guidelines range and requests that this Court overrule the defendant's objections and impose a sentence of at least 96 months, which would be squarely within the 87-108 month Guidelines range, and order forfeiture in the amount of at least $212,000.

I.      BACKGROUND

On May 23, 2014, Miserendino was indicted by a Grand Jury in the Eastern District of Virginia for Conspiracy to Commit Bribery, in violation of 18 U.S.C. § 371; Acceptance of a Bribe by a Public Official, in violation of 18 U.S.C. § 201(b)(2)(A); Conspiracy to Commit Obstruction of Criminal Investigations, in violation of 18 U.S.C. § 371; and Obstruction of Criminal Investigations, in violation of 18 U.S.C. § 1510(a).

On August 12, 2014, Miserendino pleaded guilty to Conspiracy to Commit Bribery, in violation of 18 U.S.C. § 371, and Acceptance of a Bribe by a Public Official, in violation of 18 U.S.C. § 201(b)(2)(A), pursuant to a plea agreement.

In addition to Miserendino, six other individuals have pleaded guilty in connection with the bribery scheme.  On February 12, 2014, Kenny E. Toy, the former Afloat Programs Manager for the Military Sealift Command, pleaded guilty to Bribery, in violation of 18 U.S.C. § 201(b)(2)(A), and he was sentenced on July 29, 2014, to 96 months in prison and ordered to forfeit $100,000.  On February 18, 2014, Dwayne Hardman, the co-founder of Company A and Company B, pleaded guilty to Bribery, in violation of 18 U.S.C. § 201(b)(1)(A), and he was sentenced on July 9, 2014, to 96 months in prison and ordered to forfeit $144,000.  On February 19, 2014, Michael P. McPhail pleaded guilty to Conspiracy to Commit Bribery, in violation of 18 U.S.C. § 371, and he was sentenced on August 5, 2014, to 36 months in prison and ordered to forfeit $57,000.  On March 5, 2014, Roderic J. Smith, the co-founder and former president of Company A, pleaded guilty to Conspiracy to Commit Bribery, in violation of 18 U.S.C. § 371, and he was sentenced on June 23, 2014, to 48 months in prison and ordered to forfeit $57,000.  On April 4, 2014, Adam C. White, a former vice president of Company A, pleaded guilty to Conspiracy to Commit Bribery, in violation of 18 U.S.C. § 371, and he was sentenced on July

2

11, 2014, to 24 months in prison and ordered to forfeit $57,000.  On August 14, 2014, Timothy

S. Miller, the co-founder of Company B, pleaded guilty to Gratuity Paid to a Public Official, in

violation of 18 U.S.C. § 201(c), and he will be sentenced on November 7, 2014.

## II.     OFFENSE OF CONVICTION

According to his Statement of Facts, Miserendino was a government contractor at the

Military Sealift Command, which is the leading provider of transportation for the U.S. Navy.

(Miserendino Statement of Facts, at 1.)  In that position, Miserendino worked closely with Toy,

the former Afloat Programs Manager for the N6 Command, Control, Communication, and

Computer Systems Directorate. (Id.)  In approximately November 2004, Miserendino and Toy

initiated an extensive bribery scheme that spanned five years, involved multiple coconspirators,

including two companies, and resulted in Miserendino and Toy receiving more than $265,000 in

cash bribes, among other things of value, in exchange for official assistance.

At his plea hearing, Miserendino admitted that he solicited and accepted regular cash

bribes, as well as other things of value, from two Chesapeake, Virginia contracting companies,

Company A and Company B, in exchange for providing favorable treatment to those companies

in connection with U.S. government contract work.  More specifically, Miserendino admitted

that he accepted $3,000 to $4,000 in cash bribes per month from various employees at Company

A, including co-conspirators Hardman, Smith, McPhail, and White. (Id. at 3.)  In his Statement

of Facts, Miserendino admits that different individuals at Company A each provided specific

sums of cash to Miserendino and Toy that total in excess of $200,000.[1]  (Id. at 3.)  Miserendino

---

[1]      Apparently, in his meeting with Dr. Fiester following his guilty plea, Miserendino
claimed that "the total amount of the payments [from co-conspirators at Company A] was
$25,000 over the two years." Def.'s Attachment 1-Scott Miserendino Fiester Report at 10.  In
fact, the total amount that Miserendino previously admitted to the Court that he and Toy received

also admitted that he, along with Toy, accepted a cash bribe payment of $50,000 in May 2009, from Company B's founders, Hardman and Miller.  (Id. at 4.)

In addition to the more than $265,000 in cash bribes, Miserendino admitted that he and Toy received other things of value, including flat screen televisions, laptop computers, a paid vacation rental in Nags Head, North Carolina, a football helmet signed by Troy Aikman, and softball bats.  (Id. at 4.)

 According to plea documents, in exchange for the bribes, Miserendino and Toy performed various official acts to assist Company A and Company B.  Indeed, during the conspiracy, Company A received approximately $3 million in business from the Military Sealift Command and Company B received approximately $2.5 million in business.  (Id. at 5.)

In addition to accepting bribes while holding public office, Miserendino was an active participant in a scheme to conceal his criminal activity by obstructing justice.  In approximately November or December 2010, Hardman threatened to report the bribery activities to law enforcement authorities if his co-conspirators did not provide him money.  As part of his guilty

---

from co-conspirators at Company A was upwards of $200,000.  (Miserendino Statement of Facts, at 3.)
     This is but one instance in which the report by Doctor Fiester differs in substantial respect from Miserendino's own admissions while pleading guilty and from the government's proof showing Miserendino was an enthusiastic participant who was motivated to initiate and participate in the bribery scheme because of his own greed.  Indeed, in Miserendino's Statement of Facts, he admitted that he *solicited* the bribes *for personal gain* and in exchange for *official action*, not that he was pressurized to accept bribes and accepted them only to avoid upsetting others.  (Id. at 2 ("Between November 2004 and November 2009, MISERENDINO . . . *solicited* and received . . . for *personal gain*, cash payments and other things of value from Company A and its agents, and from Company B and its agents, *in exchange for providing, and for promising to provide, various official assistance* to Company A and Company B.") (emphasis added); cf. Def.'s Attachment 1-Scott Miserendino Fiester Report at 10 (relaying Miserendino's statements that "he was just consulting and did not need to be paid," and that "Mr. Toy decided that he and Mr. Miserendino would split the money.  Mr. Miserendino said he did not need the money, but Mr. Toy told him that he should be compensated for helping out.  Mr. Miserendino did not want to upset Mr. Toy, so he agreed to accept the payments").)

plea, Miserendino admitted to engaging in a scheme to conceal his criminal activity, which involved Miserendino arranging for approximately $88,000 to be paid to one of his co-conspirators, Hardman, in an attempt to prevent Hardman from reporting the bribery scheme to law enforcement authorities.  (Id. at 6-7.)

## III.    ARGUMENT

Miserendino's criminal activity was serious, extended, and damaging to the integrity of the United States Navy Military Sealift Command.  These crimes were not the result of a momentary lapse in judgment.  Instead, over the course of several years, Miserendino coordinated an extensive bribery scheme so that he and another public official could personally enrich themselves with routine cash payments and other bribes at the expense of the public's interest.  As a result of the bribery, the decisions that Miserendino and Toy made, which should have been in the public's interest, were instead based on the cash and other rewards they received.  The bribery scheme uncovered in this investigation – which resulted in two companies, and at least five co-conspirators, obtaining an unfair advantage over competitors and corruptly receiving millions of dollars in contracting business from the federal government – is precisely the sort of serious criminal activity that deserves a serious sentence.  Furthermore, by paying for his co-conspirator's silence in an attempt to conceal the criminal conspiracy Miserendino undermined the criminal justice system and made the investigation of this case more challenging for law enforcement. Miserendino's multi-year bribery and obstruction of justice schemes constitute serious conduct that erodes the public's confidence in government and government officials.  For the reasons discussed below, the government urges this Court to sentence Miserendino to at least 96 months in prison.

### A. **Legal Standard**

The government need only prove the facts at sentencing by a preponderance of the evidence. United States v. Miller, 316 F.3d 495, 503 (4th Cir. 2003); United States v. Engleman, 916 F.2d 182, 184 (4th Cir. 1990). "The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust, 508 U.S. 602, 622 (1993) (internal quotation marks omitted); United States v. Turner, 51 F. App'x 125, 125-26 (4th Cir. 2002).[2]  A sentencing court may consider "any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy." United States v. Wilkinson, 590 F.3d 259, 269 (4th Cir. 2010); see also United States v. Fulks, 454 F.3d 410, 436 (4th Cir. 2006) (affirming the use of reliable hearsay); United States v. Love, 134 F.3d 595, 607 (4th Cir. 1998) (same).

### B. **A Two-Level Enhancement Under U.S.S.G. § 2C1.1(b)(1) is Appropriate Because the Offense of Conviction Involved More Than One Bribe.**

First, the defendant has stated that he intends to object to the two-level enhancement pursuant to U.S.S.G. § 2C1.1(b)(1), for an offense involving more than one bribe. He attempts to characterize as one single bribe over fifty separate cash payments from four different individuals at Company A, plus another $50,000 in cash payments from two different individuals at Company B, plus an assortment of other items including autographed sports memorabilia and

---

[2]  "The burden is on the defendant to show the inaccuracy or unreliability of the presentence report." United States v. Terry, 916 F.2d 157, 162 (4th Cir. 1990) (internal quotation marks omitted). The defendant must show why the information in the presentence report is incorrect, and "[a] mere objection to the finding in the presentence report is not sufficient." Id.

a vacation rental provided over five years, all of which were provided to two different public officials in exchange for multiple official acts.  His argument is entirely without merit.[3]

The Fourth Circuit has repeatedly held that when multiple acts are undertaken for a briber's benefit, and the briber made multiple payments in return for those acts, a sentencing court properly finds that multiple acts of bribery occurred.  United States v. Harvey, 532 F.3d 326, 337 (4th Cir. 2008).[4]

By his own admissions, Miserendino and his co-conspirator, Toy, received numerous bribes over the years.  In his Statement of Facts, Miserendino admitted to receiving the following different things of value at different times from different individuals:

- "Between in or around March 2005 and in or around 2008, Hardman provided approximately $90,000 in cash from his personal funds to MISERENDINO and Toy on various dates."  (Miserendino Statement of Facts, at 3.)
- "Between in or around March 2005 and in or around 2007, Smith provided at least $50,000 in cash from his personal funds to MISERENDINO and Toy, through Hardman, on various dates." (Id.)
- "Between in or around March 2005 and in or around January 2007, McPhail provided at least $45,000 in cash from his personal funds to MISERENDINO and Toy, through Hardman, on various dates." (Id.)
- "Between in or around April 2005 and in or around March 2006, White provided approximately $26,000 in cash from his personal funds to MISERENDINO and Toy, through Hardman, on various dates." (Id.)

---

[3]     As this Court is aware, it has already applied this enhancement when sentencing Miserendino's co-conspirators, including Toy, Hardman, McPhail, and Smith.

[4]     Likewise, other circuit courts consistently hold that when regular payments are intended to influence more than "a single action," the two-level enhancement pursuant to U.S.S.G. § 2C1.1(b)(1) is appropriate.  See, e.g., United States v. Middlemiss, 217 F.3d 112, 124 (2d Cir. 2000) (upholding enhancement for extortion offense where final payment was "a distinct payoff" intended to achieve separate goal from earlier payments); United States v. Martinez, 76 F.3d 1145, 1153 (10th Cir. 1996) (upholding district court's finding of multiple bribes where payments were made in exchange for ongoing patient referrals); United States v. Kahlon, 38 F.3d 467, 470 (9th Cir. 1994) (concluding that "payments to promote different applications for work papers . . . were not installment payments for a single action."); United States v. Evans, 30 F.3d 1015, 1016-17, 1020 (8th Cir. 1994) (affirming § 2C1.1(b)(1) enhancement where defendant, a state insurance examiner, accepted bribes to approve two different insurance applications), cert. denied, 514 U.S. 1028, 115 S. Ct. 1383 (1995).

- "On May 12, 2009, Miller and Hardman gave MISERENDINO and Toy $30,000 in cash bribes at Company B's offices.  MISERENDINO kept $25,000 of that sum, and Toy kept $5,000."  (<u>Id.</u> at 4.)
- "On May 14, 2009, Miller and Hardman provided Toy an additional $20,000 in cash."  (<u>Id.</u>)
- "In total, MISERENDINO and Toy jointly received at least $265,000 in cash bribes from Company A and Company B agents from March 2005 to May 2009." (<u>Id.</u>)
- "In addition to the monthly cash bribe payments, MISERENDINO and Toy accepted other things of value to influence their official acts.  The things of value included but were not limited to: flat screen televisions, laptop computers, a paid vacation rental in Nags Head, North Carolina, a football helmet signed by Troy Aikman, and softball bats." (<u>Id.</u>)

Moreover, the numerous things of value provided to Miserendino and Toy were intended influence them to take <u>a series of separate and distinct official acts</u> over several years that benefited two different companies, Company A and Company B.  By Miserendino's own admission, regular bribes were paid to Toy and Miserendino "for providing, and for promising to provide, <u>various official assistance</u> to Company A and Company B." (Miserendino Statement of Facts, at 2 (emphasis added).)  Indeed, in his Statement of Facts, Miserendino acknowledged the following separate official acts he and Toy performed, or promised to be performed, in exchange for the bribes:

- "In late 2004 and early 2005, MISERENDINO and Toy agreed with Hardman and Smith to give favorable treatment to Company A in connection with U.S. Government contracts, subcontracts, and task orders in exchange for receiving regular cash payments from Company A."  (<u>Id.</u> at 3.)

- "In late 2004, Toy and MISERENDINO arranged for an MSC contracting company to enter into a teaming agreement with Company A which would allow the contracting company to award subcontracts to Company A." (<u>Id.</u> at 3.)

- "In late 2008 and early 2009, MISERENDINO and Toy agreed to direct MSC-related work from Company A to Company B in exchange for additional bribes." (<u>Id.</u> at 4.)

- "In conjunction with the establishment of Company B, MISERENDINO and Toy assisted Company B in obtaining MSC-related task orders."  (<u>Id.</u> at 4.)

- "In total, MISERENDINO and Toy jointly received at least $265,000 in cash bribes from Company A and Company B agents from March 2005 to May 2009 that were intended to influence the official ac<u>ts</u> of MISERENDINO and Toy." (<u>Id.</u> at 4 (emphasis added).)

- "In exchange for the bribes, MISERENDINO and Toy provided official action, on behalf of MSC, that was favorable to Company A, Company B, Miller, Hardman, Smith, McPhail, White, and others, including the following:

    i. assisting in the preparation of Statements of Work for tasks that Company A and Company B sought to perform under U.S. Government contracts, subcontracts, and task orders;
    ii. influencing, or causing to be influenced, other government officials to further Company A's and Company B's efforts to obtain U.S. Government contracts, subcontracts, and task orders;
    iii. influencing, or causing to be influenced, MSC contractors to further Company A's and Company B's efforts to obtain U.S. Government subcontracts and task orders;
    iv. facilitating the transfer of government funds to MSC contractors so that Company A and Company B could receive subcontracts and task orders;
    v. providing advice to Company A and Company B on appropriate bid amounts for subcontract proposals; and
    vi. providing favorable treatment to Company A and Company B in connection with U.S. Government contracts, subcontracts, and task orders."

(<u>Id.</u> at 5.)

For these reasons, the two-level enhancement pursuant to U.S.S.G. § 2C1.1(b)(1), for an offense involving more than one bribe, is justified.

### C. A Four-Level Enhancement Under U.S.S.G. § 2C1.1(b)(3) is Appropriate Because the Offense of Conviction Involved a Public Official in a High-Level Decision Making or Sensitive Position.

The United States also concurs with the Presentence Investigation Report's application of the four-level enhancement, pursuant to U.S.S.G. § 2C1.1(b)(3), for an offense involving a public official in a high-level decision making or sensitive position.

As a preliminary matter, the government notes that the Court has already applied this enhancement when sentencing Miserendino's co-conspirators, including Toy, Hardman,

9

McPhail, and White.  Here, the enhancement applies with even greater force because Miserendino himself admitted that he actively participated in a bribery conspiracy that corrupted both himself and Toy, a high-level manager at MSC who "exercised substantial influence over the MSC contracting process by creating and executing multi-million dollar budgets, obtaining funding for MSC projects, developing and having access to sensitive information, and requesting that subcontract work be awarded to particular companies."  (Miserendino Statement of Facts, at 2 (emphasis added).)  As such, the enhancement clearly applies to Miserendino.

Under U.S.S.G. § 2C1.1(b)(3), a four-level enhancement applies "[i]f the offense involved . . . any public official in a high-level decision-making or sensitive position."[5] Application Note 4 defines a "[h]igh-level decision-making or sensitive position" as "a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process."  U.S.S.G. § 2C1.1(b)(3) app. note 4(a) (emphasis added).  "The Sentencing Commission recognized that the term 'high level' official is one which could apply to a wide range of public officials with different responsibilities in both state governments and the federal government."  United States v. Gaines, 37 F.3d 1496 (4th Cir. 1994) (concluding enhancement applied where the defendant assisted in the formulation of Navy policy, including attempts to convince European nations to buy American planes; oversaw classified programs; and prepared testimony for Congressional hearings).[6]

---

[5]     There is no dispute that Toy and Miserendino were public officials.  See 18 U.S.C. § 201(a)(1).

[6]     Courts have interpreted the term to cover a broad range of officials.  See, e.g., United States v. Richards, 674 F.3d 215, 224 (3d Cir. 2012) (affirming enhancement for county's director of human resources because "he would refer three or four of the top candidates for a job to the County Commissioners for their ultimate hiring" and he "made recommendations to his

In objecting to this enhancement, Miserendino confuses the notion of a high-level decision maker with that of one who holds a sensitive position. For the purpose of this argument, the United States does not contend that Toy held a high-level decision-making position, such as a prosecutor or judge. See U.S.S.G. § 2C1.1(b)(3) app. note 4(b). Rather, the record establishes that Toy held a "sensitive position" such as "a law enforcement officer" or "election official" and others similarly situated. See id. Accordingly, the question before the Court is whether Toy occupied a sensitive position which, by virtue of his duties and responsibilities, gave him substantial influence over the Military Sealift Command's contracting business and dealings with companies operated by the co-conspirators in this case, Company A and Company B. The facts and the law make it clear that he did.

Several cases provide useful analogies from which to conclude that the enhancement applies here. For example, in United States v. Matzkin, 14 F.3d 1014 (4th Cir. 1994), the Fourth Circuit upheld a district court's finding that a GS-15 supervisory Navy engineer and branch head, having no direct authority to award contracts, held a sensitive position under U.S.S.G. § 2C1.1(b)(3). The primary factors supporting this conclusion were: (1) the fact that the engineer's position enabled him to obtain and pass on bid and other information to an agent of incumbent contractors, which allowed them to adjust their bids; and (2) the engineer's

---

superiors"); United States v. Hill, 645 F.3d 900, 906 (7th Cir. 2011) (upholding "sensitive position" enhancement for a deputy liquor commissioner even though he "didn't establish liquor law policy or liquor commissioner policy, nor did he supervise other employees," because he "exercised substantial influence over the decision-making process"); United States v. Lazarre, 14 F.3d 580, 582 (11th Cir. 1994) (even when officials are "guided by specific policies and are restrained to a degree by rules and regulations," such officials are in sensitive positions when the "jobs involve the exercise of substantial discretion," and the ability to "make substantive decisions based on the unique circumstances of individual cases").

participation in an influential team that evaluated proposals on high dollar contracts and made recommendations to Navy officials making the procurement decisions. Id. at 1016, 1021.

Most recently, in United States v. Dodd, __ F.3d __, 2014 WL 5462536 (4th Cir. 2014), the Fourth Circuit held that the enhancement applied to a defendant who had pleaded guilty to bribing a private correctional officer and to conspiracy.  There, the defendant argued that private correctional officers are not similarly situated to jurors, law enforcement officers, or election officials – the examples in the Guidelines commentary of public officials in a sensitive position – because private correctional officers do not take an oath, are not publicly employed, do not determine guilt or innocence, and cannot arrest members of the public at large.  The Court squarely rejected this argument, explaining "[w]e agree that private correctional officers are not identically situated to any of the listed examples.  But that is not the standard; the commentary indicates that officials in a sensitive position 'include' officials who are 'similarly situated' to the examples." Id. at 4; see also id. at 3 (citing United States v. Chairez, 423 F. App'x 361 (5th Cir. 2011) (per curiam) (holding correctional officers occupy a sensitive position because they "'ha[ve] the authority and the ability to directly and significantly influence inmates' lives and the entire facility's safety with the decisions [they] make[]'")).

Similarly, in United States v. Watkins, 2010 WL 3515685, *2-*3 (N.D. Ohio 2010), the district court found that a school district official held a sensitive position with substantial influence over the process of selecting vendors because:  (1) the official sorted and culled vendor proposals for his boss, the deciding procurement official; (2) the official recommended to his boss which vendor should be selected; (3) the deciding procurement official relied on the recommending official's expertise with respect to the type of product to be purchased; and (4) the official in question possessed the authority to stop payment on invoices.  In so holding, the

district court rejected the defendant's claim that his inability to make final decisions and his lack of "unfettered discretion" precluded application of the enhancement. Id. at *2.

Finally, although not involving a contracting scenario, in United States v. ReBrook, 58 F.3d 961, 963, 969-70 (4th Cir. 1995), the Fourth Circuit also upheld the application of the sensitive position enhancement to an attorney who worked in a part-time capacity, earning up to $25,000 per year, serving as counsel to a state lottery commission, and providing political advice and drafting and document review. There, the Court found that the attorney held a sensitive position because of "the nature of the advice [the attorney] gave to the Director of the Lottery Commission, the influence that [the attorney] had with other Lottery Commission members[,] . . . and the fact that [the attorney] was privy to confidential information." 58 F.3d 961, 970 (4th Cir. 1995). The law makes clear, then, that the defendant's objection to the Presentence Investigation Report's application of the four-level enhancement is erroneous.

The defendant has already admitted facts that establish the enhancement applies in his case. At his plea hearing, Miserendino admitted that Toy was the Afloat Programs Manager and Senior Systems Engineer for the Military Sealift Command Headquarters N6 (Command, Control, Communications, and Computer Systems) Directorate during the time period of the criminal activity. (Miserendino Statement of Facts, at 2.) Miserendino also admitted that he "acting on behalf of the United States, worked closely with [] Toy . . . in managing MSC's telecommunications projects by writing statements of work, preparing and executing budgets, reviewing proposals, and influencing the awarding of U.S. Government contracts, subcontracts, and task orders." (Id.) Miserendino admitted he was aware of several official acts performed by Toy that demonstrate the sensitive nature of Toy's position, including influencing MSC contractors and other government officials to aid Company A and Company B's efforts to obtain

business, facilitating transfer of funds, and providing advice on bid amounts for proposals.  (Id. at 5.)  Importantly, too, Miserendino has specifically admitted that Toy "exercised substantial influence over the MSC contracting process by creating and executing multi-million dollar budgets, obtaining funding for MSC projects, developing and having access to sensitive information, and requesting that subcontract work be awarded to particular companies."  (Id. at 2 (emphasis added).)

In addition, the official job description for Toy's position provides further proof that Toy exercised substantial influence over the MSC contracting process.  See Exhibit 1.[7]  As the Afloat Programs Manager, Toy was the agency authority for Afloat Information Technology initiatives and spokesperson for Afloat technological innovation.  Id.  He worked closely with high-level officials to develop goals and objectives for the MSC Afloat Programs, and he exercised managerial authority to guide, direct, and oversee the operation of the Afloat Programs Directorate in the overall planning and execution of MSC Afloat C4S Programs.  Id.  Toy also exercised discretionary authority to approve the allocation and distribution of funds in the Afloat Portfolio.  Id.

Toy's resume, which is attached as Exhibit 2, provides a detailed description of the high level responsibilities he carried out in his position.  For example, it states:

> As the lead Program Manager for the MSC's [Military Sealift Command's] C4 systems, my duties include planning, programming, gathering requirements, and budgeting for current and future systems.  I am the leading shipboard communications and information technology (IT) engineer for the command.  I am responsible for all aspects of the engineering development process for the MSC's shipboard communications (C4S) architecture architectural oversight and sustainment of the afloat C4/IT enterprise and associated networks including the primary and secondary Network Operations Centers (NOCs).
>
> *       *       *

---

[7]      Exhibit 1, attached to this motion, is the official job description for Toy's position, as published by the United States Office of Personnel Management.

- <u>Managed</u> the N62 Engineering and Integration Division of 4 government staff Engineers and a contractor staff of more than 20 highly technical contractor support personnel.  Responsibilities include ensuring government staff achieve sufficient technical and management training, as well as balancing their workload.  <u>I am responsible for managing and executing in excess of $25 million dollar budget</u> for this program.  Performed all acquisitions related to duties as an ACOR for this contract.

(Exhibit 2, at 1 (emphasis added).)

Moreover, during a previous sentencing hearing on this issue, Special Agent Robert Shewell testified that Toy's former supervisors characterized his position as one that involved a substantial amount of influence over the decision-making process at the Military Sealift Command.  His former supervisor, Anthony Carroll, characterized Toy as a high ranking official and subject matter expert, and he stated that Toy served as a Contracting Officer Representative (COR) on at least one contract.  Carroll stated that Toy managed a $30 million budget on the Next Generation Wideband contract and also managed a $25 million budget for the N62 Engineering and Integration division.  Another former supervisor, Frank Shukis, stated that Toy had substantial decision-making authority on the afloat work he performed at MSC, managed a $3 to $4 million budget to support the afloat programs, and was involved with MSC contracts valued at approximately $30 million.  Shukis also stated that Toy worked independently and had a great deal of authority to manage his projects without supervision; developed and had access to sensitive information; assisted in the development of the statements of work; and was able to cause funds to be transferred by other MSC personnel.  Shukis stated that Toy's recommendations concerning the use of contracting vehicles outside of MSC carried a great deal of weight.

Moreover, there is no question that the enhancement reaches Miserendino despite the fact that it was Toy who held the sensitive position.  In pleading guilty to Conspiracy to Commit Bribery, in violation of 18 U.S.C. § 371, Miserendino admitted to facts that clearly establish that

"the offense involved . . . any public official in a . . . sensitive position," as required by U.S.S.G.

§ 2C1.1(b)(3). For example, in his Statement of Facts, Miserendino expressly admitted that he

conspired with Toy, in that he and Toy agreed to commit bribery together: "MISERENDINO

and Toy agreed with Hardman and Smith to give favorable treatment to Company A in

connection with U.S. Government contracts, subcontracts, and task orders in exchange for

receiving regular cash payments from Company A." (Miserendino Statement of Facts, at 3.)

Miserendino also admitted that he and Toy conspired together to expand the bribery scheme so

that they both could continue to receive bribes: "In late 2008 and early 2009, MISERENDINO

and Toy agreed to direct MSC-related work from Company A to Company B in exchange for

additional bribes." (Id. at 4.) Miserendino's argument that the offenses to which he has pleaded

guilty, which include conspiracy and bribery, do not "involve" Toy defies logic – and,

furthermore, it runs contrary to the findings this Court has previously made and the guilty pleas

previously entered by Miserendino's co-conspirators, including Toy, Hardman, Smith, McPhail,

and White, all of whom stated that Toy was involved in the offense.

Given Miserendino's own admissions regarding the sensitive nature of Toy's position

and the official acts Toy performed in exchange for the bribe payments, which plainly show that

he held a sensitive position, the Court should apply the four-level enhancement recommended by

the Presentence Investigation Report.

### D. A Sentence Within the Guideline Range is Appropriate Considering the Advisory Nature of the Guidelines and the 18 U.S.C. § 3553(a) Factors.

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court made clear that

sentencing courts should consult [the Sentencing] Guidelines and take them into account when

sentencing." Id. at 264; see also United States v. Biheiri, 356 F. Supp. 2d 589, 593 (2005)

("Justice Breyer's majority opinion in [Booker] sensibly teaches that the Sentencing Guidelines

must still be taken into account pursuant to 18 U.S.C. § 3553(a) in fashioning an appropriate

sentence."). The Supreme Court provided this direction to promote the sentencing goals of

Congress, namely to "provide certainty and fairness in meeting the purposes of sentencing,

[while] avoiding unwarranted sentencing disparities." Booker, 543 U.S. at 264 (quoting 28

U.S.C. § 991(b)(1)(B)). The Fourth Circuit has provided the following guidance in the wake of

Booker:

> A district court shall first calculate (after making the appropriate findings of fact)
> the range prescribed by the guidelines. Then, the court shall consider that range as
> well as other relevant factors set forth in the guidelines and those factors set forth
> in [18 U.S.C.] § 3553(a) before imposing the sentence.

United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005). Thus, sentencing courts must

consider the factors outlined in 18 U.S.C. § 3553(a), including the need for the sentence "to

reflect the seriousness of the offense, to promote respect for law, and to provide just punishment

for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. §

3553(a)(2)(A) and (B); Biheiri, 356 F. Supp. 2d at 594.

As such, section 3553(a) requires a sentencing court to consider the nature and

circumstances of the offense and the history and characteristics of the defendant, as well as the

need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the

law, provide just punishment for the offense, afford adequate deterrence to criminal conduct,

protect the public from further crimes of the defendant, and provide the defendant with needed

educational or vocational training, medical care, or other correctional treatment in the most

effective manner.

1. ***Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote the Respect for Law, and to Provide Just Punishment for the Offense (Section 3553(a)(2)(A))***

A very substantial prison sentence is necessary to reflect the seriousness of Miserendino's crimes, to provide just punishment for those crimes, and to promote respect for the law. The sentence in this case should reflect that Miserendino benefited from an extensive bribery scheme that spanned five years, involved multiple co-conspirators and two different companies, and resulted in the payment of more than $265,000 in cash bribes to two public servants, including Miserendino. The "pay-to-play" arrangement corrupted the contracting process for the United States Navy by influencing Miserendino and Toy to sell their office for personal gain. It gave Miserendino's co-conspirators' companies an unfair advantage over their competitors.

Miserendino's criminal actions are a powerful and distressing example of how greed and corruption can interfere with the effective administration of our government. Public corruption, like the sort brought about by Miserendino's crimes, breeds cynicism and mistrust of public officials. It causes the public to disengage from the democratic process, and it has the potential to shred the fabric of democracy by making the average citizen lose respect and trust in his or her government. Moreover, public corruption involving the United States Navy poses a fundamental threat to our national security. The sheer volume of contracts and subcontracts issued in relation to defense and homeland security matters, the billions of dollars at play, and the urgent circumstances under which such contracts are often negotiated combine to produce ripe opportunities for corruption and fraud.

## 2. Need to Afford Adequate Deterrence and Protect Public from Further Crimes (Section 3553(a)(2)(B)-(C))

Imposing a significant prison sentence for Miserendino would serve the important purpose of deterring future public officials and other individuals in this district and beyond from engaging in similar misconduct.

General deterrence has its greatest impact in white-collar cases, like this one, because these crimes are committed in a more rational and calculated manner than sudden crimes of passion or opportunity.  United States v. Peppel, 707 F.3d 627, 637 (6th Cir. 2013) (quoting United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006).  As one court noted,

> We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all – not only to the average citizen, but to all elected and appointed officials.

United States v. Spano, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006).

A significant sentence will also help reduce the chance that Miserendino is able to obtain another position of trust or public office.

## 3. Avoiding Unwarranted Sentence Disparities (Section 3553(a)(6))

Among his co-defendants, Miserendino is most similarly-situated to Toy, who received a sentence of 96 months in prison.  Like Toy, Miserendino was a public official, invested with the public's trust, and he abused that trust for personal gain.  Miserendino actively participated in the bribery scheme for the entire time period, and he benefited handsomely by receiving roughly one half of the $265,000 in cash bribes, as well various other things of value.  Miserendino also

played an active role in obstructing justice by arranging for Hardman to be paid approximately $88,000 in exchange for in his silence.  For all these reasons, he should receive a sentence at least comparable to Toy's sentence of 96 months.

The government notes that, unlike Toy and the other co-conspirators previously sentenced by this Court, Miserendino has <u>not</u> agreed to cooperate with the government in its investigation.  Apart from his initial interview, he has refused to speak to the government concerning this case or a continuing investigation. Additionally, as the government noted during Miserendino's plea hearing, the government is currently investigating allegations that Miserendino orchestrated a separate bribery scheme.  This investigation is still ongoing.

### 4.  *Need to Provide Restitution*

During the bribery scheme, Company A received approximately $3 million in MSC-related business and Company B received more than $2.5 million in MSC-related business. Unfortunately, it is difficult, if not impossible, to determine whether, and to what extent, the government suffered a loss due to the bribery scheme.  The government therefore is not requesting restitution.  The government notes, however, that Miserendino has agreed to sign a Consent Order of Forfeiture of at least $212,000 on or before the time of sentencing, pursuant to his plea agreement with the government.

### CONCLUSION

Based on the foregoing, the United States requests that this Court impose a sentence of at least 96 months, which would be squarely within the 87-108 month Guidelines range, and order forfeiture in the amount of at least $212,000.

October 31, 2014

Respectfully submitted,


\_\_/s/_____
Emily Rae Woods
Special Assistant United States Attorney
United States Attorney's Office for the Eastern District of Virginia
Trial Attorney
Public Integrity Section
United States Department of Justice
(202) 616-2691
rae.woods@usdoj.gov

Stephen W. Haynie
Assistant United States Attorney
United States Attorney's Office for the Eastern District of Virginia
(757) 441-6331
steve.haynie@usdoj.gov

**Certificate of Service**

I hereby certify that on the 31st day of October, 2014, I electronically filed the foregoing

to the Clerk of Court using the CM/ECF system, which will send a notification of such filing to

defense counsel.


A copy of the foregoing will also be sent to the following:

Jeffrey Noll
Senior Probation officer
827 Diligence Drive, Suite 210
Newport News, VA 23606
Jeffrey_noll@vaep.uscourts.gov


_____    /s/    _____

 Emily Rae Woods
Trial Attorney
Public Integrity Section
United States Department of Justice
1400 New York Avenue, N.W., Suite 12-100
Washington, DC 20005
Rae.Woods@usdoj.gov
(202)616-2691